Filed 8/14/25  P. v. Talley CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>　v.<br><br>OMAR TALLEY,<br><br>　　Defendant and Appellant. | B333989<br><br>(Los Angeles County<br>Super. Ct. No. LA090855) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Richard Kirschner, Judge.  Affirmed.

Bledstein & Koppekin, Irwin Mark Bledstein; The Law Offices of Jonathan Reza and Jonathan K. Reza for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Idan Ivri, Supervising Deputy Attorney General, Roberta L. Davis and Nikhil Cooper, Deputy Attorneys General, for Plaintiff and Respondent.

# INTRODUCTION

Omar Talley appeals from the judgment after a jury convicted him on two counts of rape. Talley argues the trial court violated his right to counsel of his choosing, abused its discretion in admitting prejudicial character evidence, and erred in denying his motion for an evidentiary hearing under the Racial Justice Act (Pen. Code, § 745).[1] Talley also contends the prosecutor engaged in misconduct by calling Talley and a defense witness "liars" and by eliciting testimony and making statements in her closing argument that, Talley asserts, invited the jury to sympathize with his victim. Because Talley either forfeited his arguments or has not shown prejudicial error, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A.     *Talley Rapes Kylie A.*

On April 3, 2019 Kylie A. flew from Michigan to Los Angeles to visit friends. That evening Kylie, who was 21 years old, went with Taylor B. and several other people to a nightclub in Hollywood. Kylie had four cocktails at the club and felt "tipsy." She and her friends left the club around 2:15 a.m. on April 4, 2019.

Outside the club Kylie and her friends met Deiondre Durham and Omar Talley, who invited them to an afterparty at Durham's apartment. Kylie, her friends, Talley, and Durham used a rideshare service to go to Durham's apartment several blocks away on Vine Street. After seeing there were not many

---

[1]     Undesignated statutory references are to the Penal Code.

people at the party, Kylie and her friends decided to leave. They ordered two cars through a rideshare service to go back to the hotel where some of Kylie's friends were staying. Three of Kylie's friends left the apartment when the first car arrived. Taylor and Kylie remained at the apartment with Durham and Talley, where they visited on a balcony overlooking the city. Talley and Kylie exchanged social media account information.

Talley pulled on Kylie's waist to encourage her to go inside, but Kylie said she wanted to stay on the balcony to enjoy the view. Talley convinced her to go inside the apartment by suggesting they play with Durham's dog. Kylie sat on the sofa, and Talley sat next to her and put his arm around her. Talley said "come on" and pulled Kylie to the bedroom. Inside the bedroom Talley locked the door and kissed Kylie. Kylie told Talley, "I don't sleep around." She went to the bathroom inside the bedroom suite, locked the door, and texted her friends for help. One of the messages said: "In the bathroom. I'm locked in here. Please, he is legit going to make me duck, ha ha ha.[2] [I don't know] who he is. Taylor where are you? I'm in a room." Kylie also sent her friends Talley's social media profile.

After Kylie texted her friends, Talley "somehow" got into the bathroom. As Kylie walked out, Talley kissed her mouth and breast and took off her shirt. She held the belt loops of her jeans, trying to keep them on. Kylie told Talley that she did not want to have sex and that she did not want to increase her "body count," meaning the number of sexual partners she had. Talley pulled Kylie's jeans down to her ankles. Kylie felt "paralyzed," as though "there was no way out of it," and began crying. Talley,

---

[2]     Kylie testified that her phone's auto correct feature changed the word "fuck" to "duck."

who was six feet three inches tall and weighed 170 pounds, put Kylie, who was five feet seven inches and weighed 120 pounds, on the bed.[3]  Talley climbed on top of Kylie and inserted his penis into her vagina.  He asked her, "Do you want it harder?" and Kylie responded, "No."  Talley flipped Kylie over onto her hands and knees and reinserted his penis into her vagina.

Taylor banged on the door after receiving Kylie's text messages.  Kylie got up quickly, grabbed her clothes, and left.  As Kylie left the room, Talley said, "At least let me finish."  Taylor and Kylie used a rideshare service to return to the hotel.  Inside the car Kylie sent her friends a text message stating, "Dude, I couldn't stop him."

From the hotel Kylie went to a hospital where a Los Angeles Police Department officer accompanied her to a Sexual Assault Response Team examination center.  Nurse Rosario Aguilar-Tanphanich examined Kylie and asked her about the incident with Talley.  Kylie said Talley choked her, and Aguilar-Tanphanich observed redness on Kylie's neck.  Aguilar-Tanphanich took multiple swabs from Kylie's body.  A Department criminalist analyzed 11 of the swabs and found eight of them included male DNA.  A swab taken from Kylie's left breast included a DNA profile consistent with Talley's.

---

[3]    A forensic nurse examiner testified to Talley's height and weight, but at sentencing the trial court said it doubted Talley was six foot three inches or weighed 50 pounds more than Kylie.  The court, however, said Talley "is certainly much larger" than Kylie.

B.      *The Jury Convicts Talley of Rape*

The People charged Talley with two counts of rape under section 261, subdivision (a)(2), one for each position Kylie claimed Talley had sexual intercourse with her.  The People also alleged Kylie was "particularly vulnerable" within the meaning of rule 4.421(a)(3) of the California Rules of Court.  The People also alleged four unrelated counts involving two different victims, but the trial court dismissed those counts after the People declared they were unable to proceed on them.

The jury found Talley guilty on both counts of rape, and the trial court found true the allegation Kylie was particularly vulnerable.  The court sentenced Talley to the middle term of six years on one of his rape convictions and a consecutive term of the lower term of three years on the other, for a total prison term of nine years. Talley timely appealed.

## DISCUSSION

A.      *The Trial Court Did Not Deny Talley Counsel of His Choosing*

1.      *Relevant Proceedings*

Attorneys Craig Thigpen and Hagop Kuyumjian represented Talley at his preliminary hearing on October 26, 2022.  The trial court found sufficient evidence to hold Talley to answer the six counts the People originally alleged and set Talley's arraignment for November 9, 2022.  On that date the court continued Talley's arraignment to give Talley and his family more time to raise money to retain Thigpen and Kuyumjian for trial.  By the time of the continued arraignment

on December 1, 2022, Talley had not retained Thigpen and Kuyumjian. Thigpen represented Talley as a "friend of the court," and the court appointed the public defender to represent Talley after that. The court set April 3, 2023 as the last day for trial.

At a pretrial hearing on March 2, 2023 Kuyumjian asked the trial court to appoint him as counsel for Talley in place of the public defender. The court said it would appoint Kuyumjian, so long as the trial date did not move "by more than a day or two" because, the court said, the case was "very old." The People stated they would be ready for trial the first week of April as scheduled. Kuyumjian asked for a trial date in May because he and Thigpen had "other cases . . . set in the interim" and Thigpen wanted to attend his mother's birthday party in another state in April. The court said that, because Kuyumjian and Thigpen represented Talley at the preliminary hearing, they should be "fully prepared in terms of the facts," and the court agreed to allow them to substitute in as counsel if they could begin trial on April 3, 2023. Kuyumjian said that he and Thigpen were not available on that date, but that he would "notify the public defender" if something changed. The deputy public defender asked the court to continue the trial to April 10, 2023, which the court did as an "8 out of 10 date." The court also set a pretrial hearing for March 22, 2023.

On March 9, 2023 the public defender and alternate public defender advised the court they had conflicts, and the court appointed an attorney on the bar panel to represent Talley. The court asked Talley's new counsel to give an update on March 22, 2023 regarding his preparation for trial. The court also asked if anyone had heard from Kuyumjian or Thigpen. The prosecutor

6

said that she called them that morning after learning about the conflicts, but that she had not yet heard back from either of them. Talley said that he "just got off the phone" with Kuyumjian and that they were "in close conversation and [would] communicate . . . briefly about this." Talley also said "we should have come up with a deal soon, as far as payment issues. We're getting there."

After additional motions for continuances by counsel for Talley and the People, the court set the case for trial on August 3, 2023. On that date the court continued the trial date for the last time to August 7, 2023. On the first day of trial the court dismissed the four counts the People had alleged concerning victims other than Kylie.

### 2. *Applicable Law and Standard of Review*

Talley argues the trial court denied him the right under the United States and California Constitutions to counsel of his choice. (See *People v. Grajeda* (2025) 111 Cal.App.5th 829, 837 [a "'criminal defendant has a constitutional right to counsel, guaranteed by the Sixth Amendment to the United States Constitution and article I, section 15 of the California Constitution'"]; *People v. Foley* (2023) 97 Cal.App.5th 653, 659 [same].) Though "'a defendant has no absolute right to be represented by a particular attorney, still the courts should make all reasonable efforts to ensure that a defendant financially able to retain an attorney of his own choosing can be represented by that attorney.'" (*People v. Woodruff* (2018) 5 Cal.5th 697, 728, italics omitted; see *People v. Crovedi* (1966) 65 Cal.2d 199, 207; *People v. Frias* (2024) 98 Cal.App.5th 999, 1010 (*Frias*); see also *People v. Courts* (1985) 37 Cal.3d 784, 790 (*Courts*) ["Both this

7

court and the United States Supreme Court have emphasized that trial courts have the responsibility to protect a financially able individual's right to appear and defend with counsel of his own choosing."].) "The condition of being 'financially able' for the purposes of employing counsel of choice must be limited to exclude those who cannot hire the services of chosen counsel at the time of the proceedings against him." (*People v. Lefer* (1968) 264 Cal.App.2d 48, 50; see *United States v. Friedman* (D.C. Cir. 1988) 849 F.2d 1488, 1490 ["One of the express limitations upon the right to choose one's own attorney is that the criminal defendant be 'financially able' to retain his counsel of choice."].) Once a defendant retains an attorney, the court must give that attorney "'a reasonable time in which to prepare the defense.'" (*Courts*, at p. 790; see *Crovedi*, at p. 208 ["the state should keep to a necessary minimum its interference with the individual's desire to defend himself in whatever manner he deems best, using any legitimate means within his resources"]; see also *People v. Williams* (2021) 61 Cal.App.5th 627, 655-657 (*Williams*) [trial court erred in denying a continuance to allow the defendant's preferred counsel sufficient time to prepare for trial].)

"Any limitations on the right to counsel of one's choosing are carefully circumscribed. Thus, the right 'can constitutionally be forced to yield *only* when it will result in significant prejudice to the defendant himself or in a disruption of the orderly processes of justice unreasonable under the circumstances of the particular case.' [Citations.] The right to such counsel 'must be carefully weighed against other values of substantial importance, such as that seeking to ensure orderly and expeditious judicial administration, with a view toward an accommodation reasonable under the facts of the particular case.'" (*Courts*,

*supra*, 37 Cal.3d at p. 790; see *People v. Ortiz* (1990) 51 Cal.3d 975, 983 [discussing the defendant's right to discharge retained counsel]; *Frias, supra*, 98 Cal.App.5th at p. 1010 [same].)

"Limitations on the right to continuances in this context are similarly circumscribed.  Generally, the granting of a continuance is within the discretion of the trial court.  [Citations.]  A continuance may be denied if the accused is 'unjustifiably dilatory' in obtaining counsel, or 'if he arbitrarily chooses to substitute counsel at the time of trial.'  [Citation.]  [¶]  However, 'a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality.'  [Citation.]  For this reason, trial courts should accommodate such requests—when they are linked to an assertion of the right to retained counsel—'to the fullest extent consistent with effective judicial administration.'"  (*Courts, supra*, 37 Cal.3d at pp. 790-791; see *People v. Ortiz, supra,* 51 Cal.3d at p. 984 [the "'fair opportunity' to secure counsel of choice" is limited by the state's interest in orderly and expeditious prosecutions, taking into account the practical difficulties of assembling witnesses, lawyers, and jurors at the same place and time]; *People v. Lopez* (2018) 22 Cal.App.5th 40, 46 [same].)

We review a trial court's decision denying a defendant's request for a continuance to substitute counsel for abuse of discretion.  (*Williams, supra*, 61 Cal.App.5th at p. 640 & fn. 8; see *Frias, supra*, 98 Cal.App.5th at p. 1013.)  "In deciding whether the denial of a continuance was so arbitrary as to violate due process, the reviewing court looks to the circumstances of each case, "'particularly in the reasons presented to the trial judge at the time the request [was] denied.""  (*Courts, supra*, 37 Cal.3d at

9

p. 792; see *Frias*, at pp. 1013-1014; *Williams*, at p. 634.) "'"The party challenging a ruling on a continuance bears the burden of establishing an abuse of discretion, and an order denying a continuance is seldom successfully attacked."' [Citation.] On the other hand, 'the trial court may not exercise its discretion "so as to deprive the defendant or his attorney of a reasonable opportunity to prepare."'" (*People v. Navarro* (2021) 12 Cal.5th 285, 330; see *People v. Jeffers* (1987) 188 Cal.App.3d 840, 850 [defendant has the burden to show "'an abuse of judicial discretion in the denial of his request for continuance to secure new counsel'"].) "The erroneous deprivation of a defendant's right to counsel of his choice results in automatic reversal." (*People v. Woodruff*, *supra*, 5 Cal.5th at p. 728; see *Frias*, at p. 1010; *Williams*, at p. 635.)

> 3. *The Trial Court Did Not Deprive Talley of His Right to Counsel of His Choice When the Court Denied His Request for a Continuance*

Talley has not demonstrated he was financially able to retain Thigpen and Kuyumjian when he requested a continuance as a condition of substituting them for his appointed counsel. (See *People v. Woodruff*, *supra*, 5 Cal.5th at p. 728.) Although the trial court did not deny Talley's request for a continuance on that basis, it became clear at the hearing one week later Talley still lacked the resources to hire Thigpen and Kuyumjian. Indeed, the court made clear it would reconsider Talley's request for substitution after his newly appointed counsel said he could not proceed to trial in April 2023, but Talley said he did not yet have a "deal" regarding Thigpen and Kuyumjian's fee. And Talley

10

never renewed his request to substitute counsel before the trial began almost five months later.

Because Talley did not have the resources to retain private counsel, this case is distinguishable from *People v. Crovedi, supra,* 65 Cal.2d 199 and *Williams, supra,* 61 Cal.App.5th 627, which Talley cites to support his argument the trial court deprived him of counsel of his choice. In both those cases the defendants were financially able to retain new counsel and actually retained them before asking the court to continue the trial to allow their new counsel to substitute into the case. (See *Crovedi,* at p. 201 [defendant had private counsel before arraignment and sought to substitute his new attorney for his original attorney after the original attorney had a heart attack]; *Williams,* at p. 654 [defendant retained private counsel six days before trial]; see also *Courts, supra,* 37 Cal.3d at p. 788 [defendant retained private counsel five days before trial]; *Frias, supra,* 98 Cal.App.5th at p. 1014 [defendant retained private counsel five months before trial].) Unlike the defendants in those cases, Talley was not deprived of his right to hire counsel he could afford and had retained.[4]

Moreover, even if Talley had retained Thigpen and Kuyumjian, the trial court did not abuse its discretion in ruling their reasons for requesting a continuance did not justify

---

[4] Talley did not ask the trial court for time to retain private counsel and does not argue the trial court deprived him of the opportunity to do that. (See *Courts, supra,* 37 Cal.3d at p. 790 ["'a defendant must be given a reasonable opportunity to employ and consult with counsel'"].) Nor does Talley argue he would have been able to retain Kuyumjian and Thigpen had the trial court granted Kuyumjian's request for a continuance.

11

delaying the trial. (Cf. *Courts*, *supra*, 37 Cal.3d at p. 791 [courts may not insist on expeditiousness in the face of a "'justifiable'" request for delay].) Courts have properly granted continuances to facilitate a defendant's request to substitute counsel where new counsel needed time to prepare for trial (see *Williams*, *supra*, 61 Cal.App.5th at p. 655; see generally *Courts*, at p. 790 [court must give substituted counsel "a reasonable time in which to prepare the defense"]), but Thigpen and Kuyumjian never claimed they needed more time to prepare. Instead, they requested a continuance so they could work on other matters (without identifying any conflicting court appearances) and to attend family events, even though they had known about Talley's trial date for several months. These were not justifiable reasons to delay the trial, and the trial court did not abuse its discretion in denying the requested continuance. (See *Courts*, at pp. 790-791; see also § 1050, subd. (e) ["convenience of the parties" is not "good cause" to grant a continuance].)

B.     *Talley's Argument the Trial Court Erred in Admitting Character Evidence Is Forfeited and Lacks Merit, and Any Error Was Harmless*

1.     *Relevant Proceedings*

Durham was the only witness for the defense. Durham said that, during the party at his apartment in the early hours of April 4, 2019, Kylie and Talley went into a bedroom for about 30 minutes, while he and Taylor stayed in the living room. Durham stated that, after Kylie and Talley came out of the bedroom, the four of them "hung out for a little bit longer," and then he and Talley walked the women downstairs to get a car to

12

leave. Durham said that there was "no tension" that evening and that "everybody was getting along."

Durham also said that in April 2019 he lived in an apartment on El Centro Avenue, not in the apartment on Vine Street that Kylie described. He claimed Talley had never been to his apartment on Vine Street, where he said he lived until 2017. Durham also testified that he had another party for his birthday on April 5, 2019 and that Talley attended this second party on April 5 as well.

In August 2019 Los Angeles Police Department Detective Wesley Potter interviewed Durham. Detective Potter testified that Durham said he knew Talley from the "club scene" and that Talley tried to "inflate his importance" by portraying himself as a "player." Durham described Talley to the detective as a "'wannabe.'" Durham told Detective Potter that he was in business with Talley for a short time and that he gave Talley $1,000 to invest, but that Talley lost the money in two weeks.

Detective Potter asked Durham about Talley's interactions with women. Durham described Talley as someone who "conflated [sic] his sexual prowess" and "believed that women were attracted to him . . . because he was a dominant male and that he was aggressive sexually." Durham also told Detective Potter that Talley "described himself as a sexually aggressive-by-design young man and that he believed that's what women wanted from him sexually." Durham told Detective Potter that, after the incident with Kylie in April 2019, Durham decided not to associate with Talley anymore because "'something was off.'"

On cross-examination Durham denied making most of those statements to Detective Potter. Durham also denied telling Detective Potter that Talley was "sexually aggressive," but

13

Durham did say that Talley had an "aggressive-type personality." Durham confirmed Talley lost money Durham gave him to invest. Durham also suggested he might have been confused about which party (the one on April 3-4, 2019 or the one on April 5, 2019) Detective Potter was asking him about.

Detective Potter testified as a rebuttal witness about the statements Durham made in the August 2019 interview. In addition to relating Durham's comments about Talley, Detective Potter stated Durham said he lived at the apartment on Vine Street in April 2019. Detective Potter also said that Durham never mentioned a second party on April 5, 2019 and that Durham did not appear confused about the date of the party they were discussing.

2.     *Applicable Law and Standard of Review*

Talley argues the trial court erred under Evidence Code sections 1101 and 352 in admitting as character evidence the statements by Durham and Detective Potter about the kind of person Talley was. "Evidence Code section 1101, subdivision (a) provides that, subject to certain exceptions, 'evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion.'" (*People v. Pineda* (2022) 13 Cal.5th 186, 221.) Evidence Code section 1101, subdivision (c), is one of those exceptions. It provides that section 1101 does not affect "the admissibility of evidence offered to support or attack the credibility of a witness." Thus, the restriction on admitting character evidence in Evidence Code section 1101, subdivision (a), "has no application when the

14

evidence is offered on the issue of a witness's credibility. [Citation.] Indeed, subdivision (c) of Evidence Code section 1101 expressly allows the admission of evidence for that purpose." (*People v. Abel* (2012) 53 Cal.4th 891, 928; see *People v. Stern* (2003) 111 Cal.App.4th 283, 296 [character evidence in the form of an uncharged offense was admissible as relevant to the issue of a witness's "believability"].)

Character evidence admissible under Evidence Code section 1101, subdivision (c), also "must not contravene other policies limiting admission, such as those contained in Evidence Code section 352. [Citation.] Evidence Code section 352 authorizes the exclusion of evidence by the trial court when its probative value is 'substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury. The undue prejudice that Evidence Code section 352 is concerned with is that which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues." (*People v. Pineda*, *supra*, 13 Cal.5th at pp. 221-222, internal quotation marks omitted; see *People v. Chhoun* (2021) 11 Cal.5th 1, 29.) Thus, in "applying section 352, 'prejudicial' is not synonymous with 'damaging.'" (*People v. Doolin* (2009) 45 Cal.4th 390, 439; see *People v. Parker* (2022) 13 Cal.5th 1, 40.)

"Unless the dangers of undue prejudice, confusion, or time consumption substantially outweigh the probative value of relevant evidence, a section 352 objection should fail." (*People v. Doolin*, *supra*, 45 Cal.4th at p. 439, internal quotation marks omitted; see *People v. Thomas* (2023) 14 Cal.5th 327, 363.) "In other words, evidence should be excluded as unduly prejudicial

when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction.  In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose." (*Doolin*, at p. 439; see *People v. Phillips* (2022) 75 Cal.App.5th 643, 674-675.)  "'Evidence is substantially more prejudicial than probative . . . [only] if, broadly stated, it poses an intolerable "risk to the fairness of the proceedings or the reliability of the outcome."'" (*People v. Tran* (2011) 51 Cal.4th 1040, 1047, citations omitted; accord, *Phillips*, at p. 675; see *People v. Hollie* (2010) 180 Cal.App.4th 1262, 1277 ["'A trial court should not exclude highly probative evidence unless the undue prejudice is unusually great.'"].)  "We apply an abuse of discretion standard when reviewing a ruling on an objection under Evidence Code sections 352 and 1101." (*People v. Pineda, supra*, 13 Cal.5th at p. 222; see *People v. Parker, supra*, 13 Cal.5th at p. 39.)

### 3.     *Talley's Argument Is Forfeited and Meritless, and Any Error Was Harmless*

The trial court did not rule on any objections under Evidence Code section 352 or 1101 to the allegedly prejudicial statements by Durham and Detective Potter; counsel for Talley did not object on either of those grounds.  Therefore, Talley forfeited his argument the trial court erred in admitting the statements.  (See *People v. Pineda, supra*, 13 Cal.5th at pp. 237-238 [defendant forfeited the argument the trial court erred in admitting evidence under Evidence Code sections 352 and 1101 by failing to object on either ground at trial]; *People v. Guenther*

16

(2024) 104 Cal.App.5th 483, 525 ["a 'trial counsel's failure to object to claimed evidentiary error on the same ground asserted on appeal results in a forfeiture of the issue on appeal"]; see also Evid. Code, § 353, subd. (a) [reviewing court may not set aside a verdict or reverse a judgment unless "[t]here appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion"].)[5]

Forfeiture aside, the argument lacks merit. As stated, Durham was Talley's only witness. His testimony suggested nothing untoward happened between Kylie and Talley in his apartment, and Durham arguably undermined Kylie's version of events by claiming the party Kylie attended was not at the apartment she described. Thus, Durham's credibility was "an obviously important issue." (*People v. Stern, supra*, 111 Cal.App.4th at p. 296; see *People v. Doolin, supra*, 45 Cal.4th at p. 439 [evidence of the defendant's character based on an

---

[5] Talley contends he did not forfeit his argument because contemporaneous objections would have been futile in light of a long line of cases that permit courts to admit the types of statements Durham and Detective Potter made. Talley cites *People v. Seumanu* (2015) 61 Cal.4th 1293, which considered the merits of the defendant's argument the trial court erred in admitting victim impact evidence, even though the defendant did not object to that evidence. (See *id*. at p. 1366 & fn. 20.) In *Seumanu*, however, the defendant argued the line of cases admitting certain victim impact evidence did not specifically address the argument he raised on appeal. (*Id*. at p. 1366.) Talley does not argue that the cases admitting character evidence under Evidence Code section 1101 or 352 do not apply or that they do not address the arguments he makes for the first time on appeal. *Seumanu* does not save his argument from forfeiture.

17

uncharged offense was admissible to impeach the testimony of the defendant and his witness]; *Stern*, at p. 296 [evidence of a defendant's character based on an uncharged offense is admissible to assess a witness's credibility].) As a result, the statements Durham made at trial and to Detective Potter were admissible under Evidence Code section 1101, subdivision (c).

Moreover, the statements Talley challenges were not more prejudicial than probative under Evidence Code section 352. As discussed, the statements were highly probative on the credibility of Durham and his version of events. (See *People v. Hollie*, *supra*, 180 Cal.App.4th at p. 1276 [character evidence in the form of a prior sexual offense was relevant "to evaluate the credibility of the victim" and was not unduly prejudicial under Evidence Code section 352, even though it showed "defendant's inclination to commit forcible sexual assaults"].) The statements about Talley also were far less inflammatory than the charges Talley faced. (See *People v. Chhoun*, *supra*, 11 Cal.5th at p. 29 [character evidence in the form of uncharged murders was not unduly prejudicial, where the crimes were less inflammatory than the charged murders]; *People v. Merriman* (2014) 60 Cal.4th 1, 42 [character evidence in the form of uncharged sexual assaults "was considerably less inflammatory than the murder and, therefore, its admission would not likely have had an unduly prejudicial impact on a jury"].)[6] The statements were not

---

[6] The statements were not even about prior or uncharged criminal conduct; they were about Talley's personality traits. As discussed, they were things like Talley was a "'wannabe,'" had "an 'aggressive-type personality,'" "tried to 'inflate his importance . . . to portray himself as more of a player,'"

18

substantially more prejudicial than probative and did not risk undermining the fairness of the proceedings or the reliability of the outcome.  (See *People v. Tran, supra*, 51 Cal.4th at p. 1047.)

Finally, even if the trial court erred in admitting the statements, their admission was harmless.  "'[G]enerally, violations of state evidentiary rules do not rise to the level of federal constitutional error.'"  (*People v. Jasso* (2025) 17 Cal.5th 646, 679; see *People v. Benavides* (2005) 35 Cal.4th 69, 91.)  Thus, the erroneous admission of evidence is "'state law error . . . subject to the traditional [*People v.*] *Watson* [(1956) 46 Cal.2d 818] test:  The reviewing court must ask whether it is reasonably probable the verdict would have been more favorable to the defendant absent the error.'"  (*Jasso*, at p. 679; see *People v. Winkler* (2020) 56 Cal.App.5th 1102, 1164 [applying the *Watson* standard to the admission of evidence under Evidence Code section 1101].)

By stating in his closing argument Kylie "had a change of mind after . . . engaging in sexual relations" with Talley, counsel for Talley essentially conceded Talley and Kylie had sexual intercourse in Durham's apartment.  Thus, the verdict turned on whether the jury believed Kylie's testimony Talley forced her to have intercourse without her consent.  Even if the court had excluded the statements about Talley, it is not reasonably probable the verdict would have been more favorable to Talley.

---

"'conflated his sexual prowess,'" "'believed that women were attracted to him . . . because he was a dominant male and that he was aggressive sexually,'" "described himself 'as a sexually aggressive by design young man [and] believed that's what women wanted from him sexually,'" something was "'off'" about him, and he lost money given to him by Durham to invest.

19

Kylie's testimony was corroborated by her contemporaneous text messages and the testimony of Aguilar-Tanphanich. And Durham undermined his testimony by lying about, confusing, or forgetting where he lived in April 2019.

C. *Talley's Argument the Prosecutor Committed Misconduct by Calling Talley and Durham Liars Is Forfeited and Lacks Merit, and Any Misconduct Was Harmless*

Talley argues the prosecutor committed prosecutorial misconduct in her closing argument by "intentionally confusing the night of the alleged incident" and by calling Talley and Durham "liars." This argument fails.

1. *Relevant Proceedings*

A Los Angeles Police Department detective interviewed Talley on August 11, 2019, and the People introduced the video of the interview and a transcript of the video at trial. Talley told the detective that he went to the nightclub to celebrate Durham's birthday and to Durham's apartment near Vine Street for a party with a few other people. Ten times during the interview Talley denied having sex with anyone that evening. For example, he said he did not "hook up" with anyone that night, that he "never had sex that night with anyone," that he remembered being there but "definitely wasn't sexual," and that he "never had sex that night" (repeated three times). Talley claimed that someone else had sex that evening with a girl in Durham's apartment and that she was leaving the party just as Talley arrived.

During the People's closing argument the prosecutor summarized Kylie's testimony and the evidence purportedly

showing Kylie did not consent to have sex with Talley. Then the prosecutor said: "People lied to you. People lied to you today. People lied to the officers, specifically the defendant, and you heard about it." The prosecutor also said Durham lied "about where he was living in April 2019." The prosecutor told the jurors: "You can disregard everything about [Durham's] testimony, if you want, because he is a liar." The prosecutor also said Durham tried to confuse the jury by claiming that he did not live in the apartment on Vine Street on April 4, 2019 and that there were two birthday parties and afterparties in April 2019, which the prosecutor told the jurors, "You can disregard."

The prosecutor said "the more powerful lies, the more important lies," were the "words from the defendant." She argued: "Liars hide their lies in plain sight. They hide their lies to try to pull the wool over all of our eyes to try and make you believe something else is true." The prosecutor replayed the video of Talley's police interview and counted every time Talley said he did not have sex with anyone the night of April 3-4, 2019. Counsel for Talley did not object.

Counsel for Talley suggested in closing argument Talley was confused about which party the police detective asked him about. Counsel claimed the "interrogation was all about this birthday party . . . that took place the night of April 5," not April 3-4. Counsel for Talley stated that "was a totally different event."

In her rebuttal argument the prosecutor said Talley was the only person with a "motive to fabricate." She said Talley did not claim he had consensual sex with Kylie; Talley claimed "it didn't happen." The prosecutor stated neither Talley's denial nor

21

his theory there were two parties and afterparties on different dates was reasonable.

### 2.    *Appliable Law and Standard of Review*

"Under federal law, [i]mproper remarks by a prosecutor can so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process.  [Citation.]  Under state law, a prosecutor who uses deceptive or reprehensible methods to persuade either the court or the jury has committed misconduct, even if such action does not render the trial fundamentally unfair." (*People v. Lamb* (2024) 16 Cal.5th 400, 435-436, internal quotation marks omitted; see *People v. Jones* (2024) 106 Cal.App.5th 1085, 1099.)  The prosecution, however, has "'wide latitude during closing argument to make fair comment on the evidence, including reasonable inferences or deductions to be drawn from it.'" (*Lamb*, at p. 436.)  Indeed, "[c]losing argument may be vigorous and may include opprobrious epithets when they are reasonably warranted by the evidence." (*People v. Nadey* (2024) 16 Cal.5th 102, 186, internal quotation marks omitted; see *People v. Quintero* (2024) 107 Cal.App.5th 1060, 1074 (*Quintero*).)  In particular, "'[r]eferring to the testimony . . . of a defendant as "lies" is an acceptable practice so long as the prosecutor argues inferences based on evidence rather than the prosecutor's personal belief resulting from personal experience or from evidence outside the record.'" (*People v. Dykes* (2009) 46 Cal.4th 731, 773.)

3.  *Talley's Argument Is Forfeited and Meritless, and Any Misconduct Was Harmless*

"To preserve a prosecutorial misconduct claim for appeal, a defendant must ordinarily make 'a timely and specific objection at trial' and request an admonition that the jury disregard the improper argument." (*People v. Nadey*, *supra*, 16 Cal.5th at p. 185; see *People v. Jasso*, *supra*, 17 Cal.5th at p. 698 ["'"a claim of prosecutorial misconduct is not preserved for appeal if defendant fails to object and seek an admonition if an objection and jury admonition would have cured the injury"'"'"].)  Because Talley did neither, he forfeited his argument the prosecutor committed misconduct.[7]

But even if Talley had not forfeited the argument, it is meritless.  Talley first contends the prosecutor called Talley a liar when "she knew there was ambiguity in law enforcement's questions and [Talley's] answers."  But there was no ambiguity other than the confusion Durham tried to inject at trial over the party in question.  Talley told the police detective that he had been to the nightclub "[o]ne time" and that, after that one time, he went to Durham's apartment for an afterparty.  Nothing in Talley's interview suggested Talley went to the nightclub or Durham's apartment a second time.  Talley knew which party the detective was asking him about.

Talley also argues it was improper for the prosecutor to call him and Durham liars.  But the prosecutor's statements about Talley were appropriate responses to Talley's claims he did not have sex with Kylie, and the prosecutor's statements about

_____

[7]     Talley again argues his failure to object is excused by the futility of any objection.  And again, he is wrong, and for the same reasons as before.

Durham were appropriate responses to his claim he lived on El Centro Avenue at the time Talley raped Kylie. (See *People v. Dykes*, *supra*, 46 Cal.4th at p. 773 [prosecutor's statement the "defendant lied under oath 'at will'" was "proper comment upon the evidence and upon defendant's credibility as a witness"]; *People v. Hines* (1997) 15 Cal.4th 997, 1062 [prosecutor's statement the defendant was "'a perjurer and a liar'" was an "appropriate response to the evidence of defendant's good character offered by [a] defense witness"].) The prosecutor did not base her comments on personal beliefs or experience or on evidence outside the record (see *Dykes*, at p. 773), nor did she engage in gratuitous name-calling (see *Quintero*, *supra*, 107 Cal.App.5th at p. 1074 ["a prosecutor's closing argument should focus on a defendant's conduct based on the evidence and avoid name calling"]). There was no misconduct. (See *People v. Boyette* (2002) 29 Cal.4th 381, 433 [repeatedly calling the defendant a liar was "a permissible argument," where there was conflicting evidence on the issues the prosecutor argued defendant lied about]; *People v. Fernandez* (2013) 216 Cal.App.4th 540, 562 [prosecutor did not commit misconduct by repeatedly saying the defendant and his family lied, when their statements conflicted with other evidence].)

Talley relies on *People v. Ellis* (1966) 65 Cal.2d 529, where the Supreme Court stated: "Prosecutors tread on dangerous ground . . . when they resort to epithets to drive home the falsity of defense evidence. [Citation.] The term liar, for instance, implies more than offering untrue testimony; it implies a willful falsehood." (*Id*. at p. 539, fn. omitted.) In a footnote the Supreme Court in *Ellis* acknowledged that another court had "characterized use of the term liar as 'harsh,' but 'in the realm of

24

fair comment.'" (*Id.* at p. 539, fn. 15, quoting *People v. Mora* (1956) 139 Cal.App.2d 266, 272-273.) The Supreme Court in *Ellis* distinguished *Mora* because in *Mora* "conflicting stories of witnesses were before the jury and no objection to the use of the term was made at the trial." (*Ellis*, at p. 539, fn. 15.) The same is true here. In addition, in *Ellis* the prosecutor repeatedly called the defendant and his witness "perjurers," which the Supreme Court said conveyed a "far more derogatory" connotation to the jury "than that conveyed by the term liar." (*Id.* at p. 540; but see *People v. Hines*, *supra*, 15 Cal.4th at p. 1062 [prosecutor who called the defendant a "perjurer" did not commit misconduct].) The prosecutor in this case did not call Talley or Durham "perjurers." (See *People v. Earp* (1999) 20 Cal.4th 826, 864 [distinguishing *Ellis* because the prosecutor in *Earp* said only that the defendant "had not told the truth" and did not argue "defendant's lies warranted conviction"].)

Finally, even if the prosecutor committed misconduct by calling Talley and Durham liars, any misconduct was harmless. (See *People v. Barrett* (2025) 17 Cal.5th 897, 912 ["A defendant's conviction will not be reversed for prosecutorial misconduct . . . unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct."]; *Quintero*, *supra*, 107 Cal.App.5th at p. 1075 [alleged prosecutorial misconduct was harmless where there was no reasonable probability the verdict would have been more favorable to the defendants without the purported misconduct].) As stated, other evidence corroborated Kylie's version of events, including testimony from Aguilar-Tanphanich, DNA evidence, and Kylie's text messages. And the jury could

25

reasonably infer, independent of Talley's statements and Durham's testimony, that neither witness was entirely truthful.

D.    *Talley's Argument the Prosecutor Committed Misconduct by Inviting the Jury To Sympathize with Kylie Is Forfeited and Lacks Merit, and Any Misconduct Was Harmless*

Talley argues the prosecutor committed misconduct in her direct examination of Kylie and in closing argument by inviting the jury to sympathize with Kylie. This argument fails too.

1.    *Relevant Proceedings*

The prosecutor asked Kylie several questions on direct examination about Kylie's ability to testify and how the incident with Talley affected her life. The prosecutor asked Kylie how often she thought about the incident; Kylie said, "Every day." The prosecutor asked Kylie why she thought about the incident so frequently; Kylie stated, "It's just—It's so crippling, like everything that had happened and reliving it now almost every day." The prosecutor asked what Kylie meant by "crippling." Before Kylie could answer, counsel for Talley said, "For the record . . . it's been about 20 seconds since the question was posed." The trial court stated, "She'll take as much time as she needs," and told Kylie, "There is no rush." Eventually Kylie said, "Crippling to me is like being stuck. I guess not being able to go further, move on, heal." Counsel for Talley did not object or move to strike this testimony.

The prosecutor asked Kylie how she felt the evening before she testified, and counsel for Talley objected the question was not

26

relevant.  The court overruled the objection, and Kylie responded, "Terrified."  The prosecutor continued to question Kylie:

> "Q:   Have you eaten today?
> "A:   No.
> "Q:   Did you eat yesterday?
> "A:   No.
> "Q:   Why not?
> "A:   I was sick to my stomach all day and just had really bad anxiety.
> "Q:   You said sick to your stomach, what do you mean by that?
> "A:   I was throwing up.
> "Q:   You said you have anxiety.  Anxiety about what?
> "A:   Just even being here.
> "Q:   Okay.  Having to relive what happened to you?
> "A:   Yes."

Counsel for Talley did not object to this testimony.

Kylie spoke in a soft voice throughout the trial, though she stated she did not "normally" speak softly.  At one point counsel for Talley said, "She's going to have to speak up.  It's hard to hear her."  A few times the court had to remind Kylie to speak into the microphone.  Kylie also responded to some questions by saying she was not sure or did not remember.  For example, Kylie said she could not remember whether she said anything to Talley after he pulled off her clothes.  The prosecutor asked Kylie if she was "physically emotional" when that happened, and Kylie said that she was crying and that she "felt like [she] was paralyzed and there was no way out of it."  Counsel for Talley did not object to this testimony.

Regarding Kylie's ability to recall the events of that night, the prosecutor asked Kylie whether certain memories were "less strong in [her] mind." Kylie said "yes" and explained she "worked hard to try to forget" the "worst parts." The prosecutor also asked Kylie whether she was "trying to block it out," and Kylie said she was. Counsel for Talley did not object to this testimony either.

The prosecutor also asked Kylie why she did not make direct eye contact when she spoke about the incident, and Kylie said, "It's just easier to look away than to make eye contact with someone while I talk about that." The trial court overruled counsel for Talley's relevance objection.

Counsel for Talley asked Kylie on cross-examination why she did not run away or leave the apartment once she got "bad vibes." Kylie said she went into the bathroom. Counsel also asked Kylie if she ever tried to call the 911 emergency operator or raised her voice to alert someone she was in danger. Kylie said that she did not call the 911 operator and that the music in Durham's apartment was too loud to call out to someone.

Aguilar-Tanphanich testified sexual assault victims respond differently to trauma and can have a range of reactions, including shock, anxiety, fear, self-blame, and anger. She also said some victims are "more forthcoming than others." Aguilar-Tanphanich explained that "some people have a hard time dealing with it, coping with it," and that some victims "shut down." In those instances, she said, "it's really hard to get information from them."

In her closing argument the prosecutor said: "Kylie came to you traumatized. Kylie came to you when she couldn't eat. She was tired. She had to relive the worst experience of her life

28

in front of strangers again.  She told you that she tries to block things out, but she thinks about it every day.  That she is paralyzed, that she can't move on from this.  You saw her testify. You saw her clam up.  You saw her emotions throughout the day yesterday.  Up and down, anger, frustration, sadness, silence. We know why that is."  The prosecutor also reminded the jury Aguilar-Tanphanich said victims of sexual assault respond differently to trauma.

After replaying excerpts of the video of Talley's police interview the prosecutor stated, "During the cross-examination of Kylie, [counsel for Talley] asked her why didn't you call for help? Why didn't you use your phone?  Why didn't you scream?  Why didn't you run out?"  In response to these rhetorical questions the prosecutor said:  "There is no rape-for-dummies manual.  Women do not walk into this world expecting to be raped, preserving evidence, preserving the memories in their mind so they can come and tell you what happened; that's not reasonable.  Some women don't call 911 at all.  Some of these women take years to come forward.  Some women that have been victimized by sexual assault wash their bodies and destroy the crime scene washing away the DNA.  Some women shove down those memories so deep that they never think about them.  Some women live and breathe and walk with those memories every day and are paralyzed by them, are shut down by them, and even when they're poked and forced to talk about them, they shut down. You saw Kylie.  She can't move on from the shame and the humiliation and the inhumane treatment that she received in the early morning hours of April 4 of 2019.  She can't move on from the indignity of the lack of respect for her words, for her body

language." Counsel for Talley did not object to the prosecutor's closing argument.

In his closing argument counsel for Talley said he understood Kylie texted her friends to alert them that she did not "feel comfortable." Then counsel asked, "But doesn't somebody scream at some point? Doesn't somebody call 911 at some point?" He argued there was no reason for Kylie "to scream or call 911" because her interactions with Talley were consensual.

### 2. *Appliable Law and Standard of Review*

As discussed, a prosecutor has wide latitude during closing argument to comment fairly on the evidence (*People v. Lamb*, *supra*, 16 Cal.5th at pp. 435-436), including on a witness's demeanor while testifying. (See Evid. Code, § 780, subd. (a); *People v. Garton* (2018) 4 Cal.5th 485, 501.) "A witness's demeanor can include everything from facial expressions and hand gestures to tone and attire." (*Garton*, at p. 501.)

A prosecutor, however, may not give the jury "the impression that emotion may reign over reason" or "present irrelevant information or inflammatory rhetoric that diverts the jury's attention from its proper role, or invites an irrational, purely subjective response." (*People v. Leon* (2015) 61 Cal.4th 569, 605-606, internal quotation marks omitted; see *Quintero*, *supra*, 107 Cal.App.5th at p. 1074.) And, as a "'general rule, a prosecutor may not invite the jury to view the case through the victim's eyes, because to do so appeals to the jury's sympathy for the victim.'" (*Leon*, at p. 606; see *Quintero*, at p. 1074.) "We consider the assertedly improper remarks in the context of the argument as a whole." (*People v. Covarrubias* (2016) 1 Cal.5th 838, 894; see *Quintero*, at p. 1075.)

### 3. *Talley's Argument Is Forfeited and Meritless, and Any Misconduct Was Harmless*

Talley forfeited this prosecutorial misconduct argument by failing to object to the prosecutor's questions or closing argument. (See *People v. Jasso, supra*, 17 Cal.5th at p. 698; *People v. Nadey, supra*, 16 Cal.5th at p. 185.) And he did not ask the trial court to instruct the jury to disregard any improper argument. (See *Jasso*, at p. 698; *Nadey*, at p. 185.)

As before, Talley's argument also fails on the merits. The prosecutor's questioning of Kylie and closing argument addressed Kylie's memory lapses, tone of voice, long pauses before answering questions, and lack of eye contact, all of which were relevant to Kylie's demeanor and credibility. For example, in *People v. Merriman, supra*, 60 Cal.4th 1 the prosecutor asked a witness, who "was nervous and shaken," whether she was going to be able to testify. "After the witness nodded her head affirmatively, the prosecutor reassured her, saying, 'Take your time. We'll go slow, all right.'" (*Id.* at p. 85.) The Supreme Court held the witness's testimony about her difficulties testifying in front of the defendant "tended to explain her demeanor on the witness stand and therefore was relevant to her credibility." (*Ibid.*) Similarly, in *People v. Scott* (2011) 52 Cal.4th 452 the prosecutor asked a witness, who had been discharged from a hospital after giving birth the night before, questions about her health, "so that the jury would not think she had 'a poor attitude toward the proceedings.'" (*Id.* at p. 493.) In rejecting the defendant's argument that mentioning the witness had given birth the previous evening would elicit sympathy from the jury, the Supreme Court stated that, "absent an explanation of [the

31

witness's] medical condition, the jury might have concluded that she was 'not being forthright or doesn't want to answer questions or is not able to.'" (*Ibid*.)  As in *Merriman* and *Scott*, the prosecutor's questions here about Kylie's behavior while testifying elicited testimony that explained her demeanor and were relevant to her credibility, which had ""'considerable legal consequence.'"" (*People v. Kocontes* (2022) 86 Cal.App.5th 787, 871.)

The prosecutor's closing argument addressing Kylie's demeanor fell within the prosecutor's wide latitude to fairly comment on the evidence and did not improperly appeal to the jurors' sympathy.  (See *Quintero*, *supra*, 107 Cal.App.5th at p. 1075 [statements in closing argument the rape victim had difficulty telling her mother about the incident, had flashbacks while at work, and seemed to blame herself for what happened did not improperly appeal to the jury's sympathy].)  In addition to commenting on Kylie's demeanor, the prosecutor's closing argument made reasonable inferences and deductions about Kylie's behavior based on testimony by Aguilar-Tanphanich about the nurse's experience with other sexual assault victims. These statements too were fair comment on the evidence, as well as proper rebuttal to the defense theory Kylie would have screamed if Talley were raping her.  (See *People v. Edwards* (2013) 57 Cal.4th 658, 740 [in closing argument the prosecutor may rebut the defense counsel's characterization of the prosecution's evidence].)

Finally, even if the prosecutor's questions and arguments were an improper appeal for sympathy for Kylie, it is not reasonably probable that, had the prosecutor not asked those questions and made the argument, the verdict would have been

more favorable to Talley.  (See *People v. Martinez* (2010) 47 Cal.4th 911, 957; *Quintero*, *supra*, 107 Cal.App.5th at p. 1075.) The evidence against Talley was strong, and the trial court instructed the jurors not to "let bias, sympathy, prejudice, or public opinion influence your assessment of the evidence or your decision." We presume the jury followed the court's instructions. (*Martinez*, at p. 957; *Quintero*, at p. 1075.)

### E.    *The Trial Court Did Not Err in Denying Talley's Motion Under the Racial Justice Act*

#### 1.    *Relevant Proceedings*

After the jury returned its verdict Talley filed a motion alleging a violation of the Racial Justice Act (§ 745) and requesting an evidentiary hearing.  Talley claimed Detective Potter exhibited bias against him based on his race as an African American by "evoking animal imagery in a racist fashion in falsely interpreting comments made by [Durham] in an attempt to discredit [Durham] and [Talley]."

In particular, Talley alleged Detective Potter stated Talley was an "'alpha male' who 'conflated his sexual prowess because he is a dominant male'" and "a 'wannabe' or 'hanger on' who 'inflates his importance.'"  Talley alleged there is "a long history in [the] United States that uses stereotypes to sexualize African-Americans" and cited, in a footnote, "'Stereotypes of African Americans' on the website Wikipedia."  Talley further claimed "[t]erms like alpha male and dominant male as they pertain to 'sexual prowess,' are a not so subtle attempt to inject the animal kingdom into the trial, knowing full well of the long history of racist dehumanizing association of African Americans with apes

33

and gorillas, etc."  For that proposition Talley cited an article titled, "Not Yet Human: Implicit Knowledge, Historical Dehumanization, and Contemporary Consequences" from the Journal of Personality and Social Psychology.  Talley asked for an evidentiary hearing under section 745, subdivision (a), and an appropriate remedy upon proof of a violation of that provision.

The People opposed the motion.  They argued Talley's allegations failed to make a prima facie showing Detective Potter's testimony violated the Racial Justice Act.  The People further argued Talley failed to show how the sources he cited (which Talley did not attach to his motion) related to his claims Detective Potter's testimony "'evok[ed] animal imagery in a racist fashion,'" nor did Talley explain how the terms Detective Potter used were racist or based on racial stereotypes.

Talley filed a reply arguing Detective Potter "invoke[d] animal imagery into the trial," primarily by using the term "dominant male" in referring to Talley's "sexual prowess."[8] Talley argued:  "Because use of animal imagery is historically associated with racism, use of animal imagery in reference to a defendant is racially discriminatory and should not be permitted in our court system."  Talley attached to his reply the Wikipedia entry cited in his motion and asserted the terms Detective Potter

---

[8]     After filing his petition Talley obtained a trial transcript showing Detective Potter did not use the term "alpha male." Talley's reply alleged Detective Potter used the term "dominant male" and not "alpha male" in describing how Durham perceived Talley.  Talley does not on appeal assert Detective Potter used the term "alpha male."

34

used were "likely the subject for an expert witness in determining the effect it may have had on the jury."

The Wikipedia entry Talley cited and attached to his reply was titled "Dominance Hierarchy" and addressed "a type of social hierarchy that arises when members of animal social groups interact, creating a ranking system." The entry explains the primary costs and benefits of dominance and subordinance and provides examples from a variety of animals, including goats, birds, insects, primates, rodents, sheep, dwarf mongooses, deer, hyenas, geese, red foxes, mole-rats, lemurs, meerkats, hamsters, and elephants.[9]

The trial court found Talley failed to make a prima facie showing the facts he alleged, if true, established a substantial likelihood there was a violation of section 745, subdivision (a). The court ruled: "The allegations are conclusionary without supporting evidence; they're evidence free."

## 2. *Appliable Law and Standard of Review*

The Racial Justice Act "prohibits the state from seeking or obtaining a criminal conviction, or seeking, obtaining, or imposing a sentence, on the basis of race, ethnicity, or national origin." (*People v. Wilson* (2024) 16 Cal.5th 874, 945; see § 745, subd. (a).) A "defendant may establish a violation of the Act by proving by a preponderance of the evidence that one of the following occurred: '(1) The judge, an attorney in the case, a law enforcement officer involved in the case, an expert witness, or juror exhibited [racial] bias or animus towards the defendant'; or

---

[9]     The People claim the Wikipedia entry includes references to "humans" as well, but the only references to humans in the entry are in the footnotes listing source materials.

'(2) During the defendant's trial, in court and during the proceedings, the judge, an attorney in the case, a law enforcement officer involved in the case, an expert witness, or juror, used racially discriminatory language . . . or otherwise exhibited [racial] bias or animus towards the defendant . . . , whether or not purposeful.'" (*Wilson*, at p. 945; see § 745, subd. (a)(1), (2).)  The Racial Justice Act defines "'[r]acially discriminatory language'" to mean "language that, to an objective observer, explicitly or implicitly appeals to racial bias, including, but not limited to, racially charged or racially coded language, language that compares the defendant to an animal, or language that references the defendant's physical appearance, culture, ethnicity, or national origin."  (§ 745, subd. (h)(4); see *People v. Wagstaff* (2025) 111 Cal.App.5th 1207, 1217.)

"When a defendant files a motion in the trial court alleging a violation of the Racial Justice Act, the first step is for the trial court to determine whether the defendant has made 'a prima facie showing of a violation.'  [Citation.]  The statute specifically defines "'[p]rima facie showing'" to mean 'that the defendant produces facts that, if true, establish that there is a substantial likelihood that a violation of subdivision (a) occurred.'  [Citation.]  The statute further states that 'a "substantial likelihood" requires more than a mere possibility, but less than a standard of more likely than not.'  [Citation.]  Moreover, 'a defendant seeking relief under the Racial Justice Act must state fully and with particularity the facts on which relief is sought, and include copies of reasonably available documentary evidence supporting the claim.  The court should accept the truth of the defendant's allegations, including expert evidence and statistics, unless the allegations are conclusory, unsupported by the evidence

36

presented in support of the claim, or demonstrably contradicted by the court's own records. . . . [T]he court should not make credibility determinations at the prima facie stage.'" (*Jackson v. Superior Court* (2025) 109 Cal.App.5th 372, 381; see *Mosby v. Superior Court* (2024) 99 Cal.App.5th 106, 131; *Finley v. Superior Court* (2023) 95 Cal.App.5th 12, 23.)

"Once a defendant makes a prima facie showing, the trial court proceeds to determine whether the defendant has met 'the burden of proving a violation of subdivision (a) [of section 745] by a preponderance of the evidence.' [Citation.] The applicable remedies are set forth in subdivision (e) of section 745." (*Jackson v. Superior Court, supra*, 109 Cal.App.5th at pp. 381-382; see § 745, subd. (c)(2).) "In an appeal from a trial court ruling that a defendant failed to make a prima facie showing of a Racial Justice Act violation, we apply a de novo standard of review." (*Jackson*, at p. 382; see *People v. Howard* (2024) 104 Cal.App.5th 625, 650-651.)

### 3. *Talley Did Not Make a Prima Facie Showing Under Section 745*

Talley argues his allegations, if true, would establish Detective Potter used racially discriminatory language to describe him. As the trial court ruled, however, Talley submitted only conclusory allegations Detective Potter, who was merely repeating what Durham had said, used the terms "dominant male," "wannabe," and "hanger on" to appeal (explicitly or implicitly) to racial bias. Talley submitted no evidence any of those terms would evoke "'animal imagery in a racist fashion'" to an objective observer. The Wikipedia entry Talley provided showed the term "dominant male" may be used to describe a wide

37

variety of animals, having no implicit or explicit racial overtones. (See *Quintero*, *supra*, 107 Cal.App.5th at p. 1077 [the term "'monster' may be suggestive of an animal or beast," but "itself is race-neutral"].) The sources cited in the Wikipedia entry also show the concept of "dominance" is used to describe human interactions, as well as animal interactions.[10] Talley does not otherwise explain how the terms Detective Potter used are racially charged or coded or compared Talley to an animal. Tally failed to make a prima facie showing of a violation under section 745, subdivision (a). (See *People v. Lawson* (2025) 108 Cal.App.5th 990, 1001 [defendant failed to make a prima facie showing under the Racial Justice Act where his motion did not explain how the terms "thief, fraudster, liar, and coward" were racially charged or coded].)[11]

---

[10] For example, the sources cited included articles titled "Dominance, prestige, and the role of leveling in human social hierarchy and equality" and "The nature and measurement of interpersonal dominance."

[11] Talley contends the cumulative effects of the trial court's errors require reversal. Because we find no error, there was no cumulative error. (See *People v. Cordova* (2015) 62 Cal.4th 104, 150; *People v. Foster* (2021) 61 Cal.App.5th 430, 433.)

38

## DISPOSITION

The judgment is affirmed.

SEGAL, J.

We concur:

MARTINEZ, P. J.

STONE, J.